OPINION OF THE COURT
Joseph Slavin, J.
The petitioner (hereafter ABCO) in this article 78 proceeding seeks to annul the determination of the respondents’ (hereafter Board) cancellation of a previously awarded bus contract. ABCO was one of a group of successful low bidders on various transportation of handicapped pupils’ contracts for which the Board had requested bids. Involved in this proceeding are the three specific routes identified by specific serial number in the moving papers.
ABCO has been a responsible contractor for eight years, transporting children under similar existing (and renewed *713 each year without any major change except for the cost factors) contracts. Other than routine disallowance of certain claims, on routine audits, the Board had no complaints as to the manner in which these contracts have been complied with. For all these years, ABCO’s three stockholders have been the same people.
After the advent of the new city administration and the appointment of the new chancellor, the Board decided to recast the contracts and to put them out for new public bidding.
A "new” contract was prepared by the Board. Copies were circulated among the industry and public interest groups. Two so-called conferences for bidders were held, one in December, 1978 and another in January, 1979. It appears that some 300 people attended the first conference, where the proposed form of contract was discussed in what the Board’s witness categorized it to be, a detailed way. The January meeting seems to have been perfunctory.
Based on the credible testimony before me, I find that at neither meeting was there any indication by the Board of the purpose for the requirement that each successful bidder must subject himself (or if a corporation, then the corporate stockholders and/or directors) to an investigation by the city Department of Investigation (D.O.I.). Also, and to move to the heart of the matter, neither was there any discussion of any sort of the paragraph headed award, which reads: "The award of Contract, if made, will be made according to law, as soon after the opening of bids as practicable, by item, to the lowest re-ponsible bidder offering the lowest weighted average daily rate per vehicle for extended and regular service as specified in each item” (emphasis supplied; typographical error so in original; respondent’s Exhibit A).
Based upon the Board’s contention that they, in effect, can interpret the two magic words "responsible bidder” as they see fit (without any reference to any guidelines), they determined that ABCO was not a responsible bidder. This determination (initially made by the Board and sustained by their own Board of Review) was allegedly based on the fact that two of the three stockholders have criminal records. One of these two, Lorenzo Lampasi, owns 50% interest; the other, Lawrence Paladino, 25%. The third stockholder holds the other 25% interest.
As already indicated, there are no promulgated standards or *714 policies of "the Board for the awarding of bus contracts as applied to the use of the words "responsible bidder” as a basis for disqualifying a successful low bidder. The issue before me is whether the Board may interpret the words as it sees fit and secondarily, as claimed by the petitioner, even the interpretation used by the Board has not been uniformly enforced.
On trial, it was the Board’s position that they "require the highest moral standards to be exhibited by the contractors and evidence of prior criminal behavior is sufficient to disqualify a contractor who seeks to be entrusted with the custody and care of the children of our community”. While generally one might tend not to quarrel with this position, it could present problems with the view that persons convicted of a crime can be rehabilitated and that the stigma of the conviction should not follow them forever so as to prevent their total return to productive society. However, the Board never publicly made any definitive public statement about the moral standards they were adopting.
Despite the holding of conferences by the Board for potential bidders and the public at large, no rules, regulations or standards were articulated or promulgated to or for the prospective contractors. Nowhere were the contractors advised that prior criminal records of principals would be a bar to a contract award from the Board. At no time were the contractors given a reasonable time to divest any stockholders with criminal records of their stock in the corporation, nor were the potential contractors advised as to what crimes would be deemed serious, deemed so remote as not to be considered or deemed not serious enough to be a basis for disqualification.
It is clear that the only "standards” of the Board were those that were devolved internally, and which in no way were made public.
Even these internal standards were not articulated (other than in the internal conferences among the staff members of the Bureau of Pupil Transportation and its support staff from the Offices of Legal Services and the Commercial Division) until a memo dated March 19, 1979 from Florence Flost, the Director of Transportation to a Dr. Richard Halverson entitled "Criteria for Rejecting Bids for School Bus Contracts”. The preamble to that memo (respondent’s Exhibit H) states that at a staff meeting held a few days earlier that "The following were agreed upon as our recommendations”.
*715 The memo insofar as it applies to this proceeding reads:
"II. After opening bids, criteria upon which the Board of Review determination would be sought for the Purpose of Rejecting Bids. * * *
"F. Recommendations of D.O.I., based on evidence of criminality of principals in the company.
"Notes: 1) There must be consistency in application of criteria for disqualification of bidders.”
ABCO, as stated above, was a low bidder. Its stockholders subjected themselves to the required interview by the D.O.I. The D.O.I. made no recommendations. They did report on the criminal background of the two stockholders.
As to Mr. Lampasi, his conviction was to filing a fraudulent F.H.A. application in 1964. The Board’s witness before me conceded that it was not the kind of crime which would lead one to believe that we could not entrust our children’s care to a bus company in which he was a principal.
In fact, the credible evidence before me showed that despite investigations by the Board which resulted in findings that the principals of other low bidders had criminal records which could be called serious, contracts were awarded to them. Contracts were awarded to companies where the person or stockholder either asserted his Fifth Amendment rights and refused to answer questions (cf. section of contract headed "Investigations” which authorizes a five-year disqualification for failure to answer); actively participated in bribing city officials; accepting, while a police officer, a bribe; harassment, resisting arrest, operating a motor vehicle without a license and leaving the scene of an accident; and possession of a firearm.
These companies have active members who have evidenced past conduct which could have a bearing on the safe transportation of children, as distinguished from the Lampasi crime.
Clearly, the pattern of prior criminal involvements by other contractors shows that the Board exercised little uniformity of enforcement with reference to their prior records. The Board was unable to illustrate to the court any standard of criteria which it used to disqualify ABCO, and to determine that the companies set forth above were of the "highest moral standards”. Instead, the record shows that the Board used a helter-skelter approach without any evidentiary or reasonable criteria to guide it. As the witness put it, each bidder would *716 have to do his own legal research to determine the possible meanings and interpretations of the operable words.
This court has the authority to review in this proceeding the acts of an agency which acted in an arbitrary, capricious or unreasonable manner (Matter of Pell v Board of Educ., 34 NY2d 222).
Therefore, from all the credible evidence before me, I find that the Board has acted, insofar as ABCO is concerned, in an arbitrary, capricious and unreasonable manner and the application is granted subject to the following provisions. The ABCO entity should not be punished merely because one of its principals may be disqualified from being a part of the corporation.
This court also has the power to consider the requirements of public policy and to protect the welfare of those members of our society who most require the protection of this court. In providing for the care and welfare of handicapped children, the criminal backgrounds of those who seek to transport them may be considered rationally. The basic policy of the Board — if it is properly spelled out, so that prospective bidders can make an intelligent decision as to bid or not and be given a reasonable and fair opportunity to have a contract awarded — is sound. With the foregoing in mind, we turn to Mr. Paladino. His background of conviction for extortion and a revocation of probation for associating with persons having criminal records, in violation of the terms of his probation, is one which in the eyes of the court would provide a valid basis for the Board to consider in denying a contract. Therefore, the order and judgment herein annulling the Board’s determination shall provide that ABCO Bus Co., Inc., is to retain the contracts on which it successfully bid provided that Lawrence Paladino, within six months from the date thereof in good faith sell his stock to the other stockholders or to other persons unconnected by ties of blood or marriage to him and that he, in the interim, desist from directly or indirectly participating in the business affairs of ABCO Bus Co., Inc. The corporation shall so certify, in writing, under oath, and permit the Board to inspect the transfer documents. If an outside purchaser is involved, that person shall submit himself to the D.O.I. interview as if he were an owner at the bid stage. Upon failure to comply with this direction, the Board may terminate the contract.